**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

DR. HERBERT J. KITCHEN,
JEAN JOHNSON,
MAKHI JOSEPH BERINYUY JAFF,
AALIYAH HARRIS,
SHAKIYA RIHANNA KIMBLE,
LARON JONES, and
JAYDAN MONEE WARE,

Plaintiffs,

v.

THE STATE OF MISSOURI;
THE COORDINATING BOARD FOR HIGHER EDUCATION OF THE STATE OF MISSOURI;
GOVERNOR MICHAEL KEHOE, in his official capacity as Governor of the State of Missouri;
DR. BENNETT BOGGS, in his official capacity as Commissioner of Higher Education and Workforce Development of the State of Missouri; and
DR. MUN Y. CHOI, in his official capacity as President of The University of Missouri System,

Defendants.

Case No. _______________

COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Dr. Herbert J. Kitchen, Jean Johnson, Makhi Joseph Berinyuy Jaff, Aaliyah Harris, Shakiya Rihanna Kimble, LaRon Jones, and Jaydan Monee Ware (collectively, "Plaintiffs"), each in his or her individual capacity, by and through the undersigned counsel, bring this civil action based upon personal knowledge and the investigation of counsel against Defendants the State of Missouri; the Coordinating Board for Higher Education of the State of Missouri; Governor Michael Kehoe, in his official capacity; Dr. Bennett Boggs, in his official capacity as Commissioner of Higher Education and Workforce Development; and Dr. Mun Y. Choi, in his official capacity as President of The University of Missouri System (collectively, "Defendants").

## SUMMARY OF THE CASE

1. Plaintiffs are alumni, a former student, and four currently enrolled students of Lincoln University of Missouri ("Lincoln" or "LU"). Each brings this action in his or her individual capacity to remedy injuries he or she personally suffered because the State of Missouri, for more than three decades, withheld from Lincoln University the state funding that federal law required as a condition of the federal land-grant money Missouri accepted, and did so on a basis traceable to Missouri's prior de jure system of racially segregated higher education. Plaintiffs seek compensatory damages for their own educational and economic injuries under Title VI of the Civil Rights Act of 1964, and prospective declaratory and injunctive relief against the responsible state officials under the Equal Protection Clause of the Fourteenth Amendment, enforced through 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), to eliminate the continuing effects of that violation.

2. The State of Missouri operated a de jure segregated system of higher education. It founded the University of Missouri in 1839 for white students only. It designated Lincoln, founded by formerly enslaved Black soldiers, as its separate land-grant institution for Black students under the Second Morrill Act of 1890. Under *United States v. Fordice*, 505 U.S. 717 (1992), that history imposes on Missouri a present and continuing constitutional duty to eliminate policies traceable to the dual system that continue to produce segregative effects. Missouri has not discharged that duty. It has instead perpetuated a funding structure that, in every fiscal year from 1987 through 2020, appropriated less per student to Lincoln than to the University of Missouri, and that conditioned Lincoln's receipt of statutorily mandated matching funds on performance criteria never applied in equivalent form to the University of Missouri.

3. The federal government has quantified the result. On September 18, 2023, the United States Secretaries of Agriculture and Education wrote to Missouri's Governor documenting that Missouri had underfunded Lincoln University by $361,569,760 between fiscal years 1987 and 2020, calculated from the federal government's own Integrated Postsecondary Education Data System. Missouri has taken no remedial action.

4. The State's own records confirm the mechanism. From fiscal year 2000, when federal law first required a specific state match of Lincoln's federal land-grant allocation, through fiscal year 2007, Missouri appropriated no match at all. From fiscal year 2008 through fiscal year 2021, Missouri appropriated between eleven and fifty-one percent of the required match. Lincoln University covered approximately $43.5 million of the State's obligation from its own general operating funds between fiscal years 2000 and 2016, forfeited approximately $7.97 million in federal allocations to the United States Department of Agriculture in fiscal years 2016 through 2018 when it could no longer do so, and obtained federal waivers of the balance. Across fiscal years 2000 through 2024, approximately $65.8 million of the match that federal law required was paid by neither the State nor the University. Missouri fully matched the University of Missouri's federal land-grant allocations in every one of those years.

5. The harms alleged are not historical abstractions. Plaintiff Jaff attended Lincoln in 2023 and 2024 and experienced failing infrastructure, inadequate nutrition, and absent support services that directly resulted from Missouri's underfunding. He left without a degree. Plaintiff Johnson, who attended from 1992 to 1998, was told by Lincoln administrators during her enrollment that the State had always promised Lincoln its land-grant money but that it would never come because Lincoln was not the University of Missouri. She then spent a decade of volunteer leadership petitioning the State to honor that obligation, including a 2017 appeal to the Missouri General Assembly at which now-Governor Kehoe was present. Plaintiff Kitchen, who graduated in 1988, is the great-great-grandson of one of the soldiers whose own pay founded Lincoln in 1866. Plaintiff Harris is a sophomore agriculture major enrolled at Lincoln today, living in the same residence hall whose failures Plaintiff Jaff documented two years ago, and she will remain enrolled through December 2028. Plaintiff Kimble is a junior in plant and soil science who enrolled on a scholarship she understood would cover her education, saw it withdrawn, and now borrows and works twenty to thirty hours a week to remain enrolled through May 2028. Plaintiff Jones is a junior in agricultural business who works weekly in the laboratory of the University's 1890 research center, schedules around courses his degree requires but the University cannot reliably

offer, and works off campus to stay enrolled. Plaintiff Ware is a sophomore in computer information systems from Illinois who serves as treasurer of the Student Government Association, lives in a residence hall today, could not enroll in the introductory course for her major because the single section was full, and lost fifteen pounds in her first semester because the dining hall closed before her band practice ended. The injury to each is personal, concrete, and continuing.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) and (4) because this action seeks to redress the deprivation, under color of state law, of rights secured by the Constitution and by Acts of Congress providing for equal rights. This Court is authorized to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

7. This action arises under the Equal Protection Clause of the Fourteenth Amendment; 42 U.S.C. § 1983; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. The Second Morrill Act of 1890 and its matching provision, 7 U.S.C. § 3222d, establish the statutory obligation whose breach constitutes the factual predicate of the constitutional and Title VI claims.

8. Sovereign immunity does not bar this action. As to the Title VI claim against the State of Missouri and the Coordinating Board for Higher Education, Congress has expressly abrogated Eleventh Amendment immunity, 42 U.S.C. § 2000d-7(a)(1), and Missouri knowingly accepted federal funds subject to that condition. As to the Equal Protection claim, Plaintiffs seek only prospective declaratory and injunctive relief against state officials in their official capacities, which the Eleventh Amendment does not bar. *Ex parte Young*, 209 U.S. 123 (1908); *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002).

9. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants Kehoe, Boggs, and the Coordinating Board reside in this district, because

Lincoln University is located in Jefferson City within this district, and because a substantial part of the events and omissions giving rise to the claims occurred here.

## PARTIES

**Plaintiff Dr. Herbert J. Kitchen**

10. Plaintiff Dr. Herbert J. Kitchen is a natural person residing in Portland, Oregon. He is over 18 years of age and competent to testify to the matters stated herein.

11. Dr. Kitchen attended Lincoln University of Missouri from 1984 to 1988, earning a Bachelor of Science degree in Marketing.

12. Dr. Kitchen comes from a multi-generational Lincoln University family spanning at least four generations. His father, Edgar Kitchen, attended Lincoln from 1944 to 1946. His uncle, Herbert J. Kitchen, graduated from Lincoln in 1940. His aunt, Dorothy Kitchen, graduated from Lincoln in 1934 and again in 1955. His siblings and in-laws, Douglas, Wayne, Barbara, Milton, Carla, Karen, and Ali, are all Lincoln graduates. His niece Janae Akins and grand-niece Ariyen Akins have also attended Lincoln.

13. Dr. Kitchen is a direct descendant of Caleb Lindsey (1846 to 1919), a member of the 62nd United States Colored Infantry, who along with other members of the 62nd and 65th Infantries founded Lincoln Institute in 1866, which became Lincoln University.

14. During his enrollment, Dr. Kitchen personally experienced the effects of chronic underfunding. From 1984 to 1988, the institution underwent leadership instability with five different presidents, fostering an environment of uncertainty and persistent rumors of closure and loss of accreditation. This instability caused anxiety for Dr. Kitchen and his peers and impaired his educational experience. The resource deficiencies he experienced deprived him of the educational parity available to students at predominantly white institutions in Missouri during the same years.

15. Following graduation, Dr. Kitchen served for nearly three decades in the Peralta Community College District in California, ultimately as Director of Student Activities, with career total earnings exceeding $2 million. Throughout that career, his degree from Lincoln University

was undervalued in professional settings as a consequence of the reputational deficit that Missouri's sustained underfunding of the institution produced.

16. Dr. Kitchen's injury is continuing. The value of his Lincoln University degree in the professional marketplace depends on the standing of the institution that conferred it, and that standing is diminished, year by year, so long as Missouri continues to fund Lincoln below the level federal law requires. Prospective relief that restores Lincoln's institutional capacity would redress that continuing diminution.

17. Dr. Kitchen brings this action to secure redress for his own injury and to honor the legacy of his family, including the founding sacrifice of his great-great-grandfather. He is willing to be publicly identified as a named plaintiff, to provide deposition testimony, and to testify at trial.

**Plaintiff Jean Johnson**

18. Plaintiff Jean Johnson is a natural person residing in Detroit, Michigan. She is over 18 years of age and competent to testify to the matters stated herein.

19. Ms. Johnson attended Southern University in Baton Rouge, Louisiana, from the fall of 1990 through the spring of 1992. She transferred to Lincoln University of Missouri in the fall of 1992 and graduated in December 1998 with a Bachelor of Science degree in Health and Physical Education.

20. Upon her transfer, Lincoln accepted few of the credits Ms. Johnson had earned at Southern University. The loss of those credits extended her time to degree to more than six years and materially increased the cost of her education.

21. Ms. Johnson never lived in campus housing, because its cost was prohibitive for her family. She worked throughout her enrollment, and during her final three years she worked substantial hours to remain enrolled. She borrowed approximately $60,000 in student loans to attend Lincoln. Her grade point average declined to 2.4 as a direct consequence of the hours she was required to work. Only in her final year did she learn of a regional tuition reciprocity program for which she had been eligible throughout her enrollment and which would have reduced her cost

of attendance by approximately $1,200 per year. No advisor had informed her of it, because Lincoln lacked the advising capacity that adequate funding would have provided.

22. During her enrollment, Ms. Johnson personally experienced the physical consequences of Missouri's underfunding. The stairwells of the Martin Luther King building were so poorly lit that students did not walk them alone. Debris fell from the ceiling of Richardson Auditorium onto students performing beneath it. Exterior stairways between the Martin Luther King building and the student center went unsalted in winter, and Ms. Johnson fell on them repeatedly. The cafeteria furniture was broken. The weight-training equipment in Jason Gymnasium was old and damaged. Lincoln had no swimming pool, so that Ms. Johnson and other students majoring in Health and Physical Education were required to travel off campus to a YMCA for the swimming instruction their degree program required. Throughout her six years of enrollment, students were told that a pool and a resurfaced track would be built with state funds. Neither was built during her enrollment. Ms. Johnson could not attain proficiency in the aquatic and racquet instruction her degree program required, because the facilities in which to attain it did not exist.

23. During her enrollment, Lincoln University administrators told Ms. Johnson and other students that the State of Missouri had always promised to provide Lincoln with its appropriated land-grant monies, but that it would not happen because Lincoln was not the University of Missouri. That statement, made by the institution's own administrators to its students in the 1990s, is a contemporaneous acknowledgment that the funding disparity alleged in this complaint was understood, at the time, to turn on Lincoln's identity relative to the State's predominantly white land-grant institution.

24. Ms. Johnson earned a degree in Health and Physical Education but was unable to enter the field for which that degree prepared her. She built a career in retail management, banking, and social services, and is presently employed as a Service Coordinator. Had adequate resources been available to her at Lincoln, she would have pursued study in the sciences. Her Lincoln degree has been undervalued in professional settings. At one employer, a colleague without a degree in the

relevant field, and who had attended a different institution, was compensated at a higher rate for comparable work.

25. Ms. Johnson has served Lincoln University continuously in the twenty-eight years since her graduation. She has been a member of the Detroit alumni chapter and a charter member of the Cleveland Metro chapter, and she has recruited students to Lincoln and mentored them after enrollment. She served the Lincoln University National Alumni Association as Fundraising Chairman from 2010 to 2012, as National Treasurer from 2012 to 2015, and as National President from 2015 to 2018, the youngest person ever elected to that office. Her portrait hangs in Memorial Hall. She presently serves as Vice President of the Detroit Metro chapter.

26. As National President, Ms. Johnson organized and led alumni advocacy directed at the State of Missouri concerning Lincoln's land-grant funding. On February 8, 2017, she convened Lincoln alumni from across the country in Jefferson City for a day of appeals to the Missouri General Assembly, at which alumni went office to office with prepared talking points and fact sheets urging legislators to support a $6.2 million appropriation of state funds for Lincoln University's 1890 land-grant program. In the course of that day, alumni including Ms. Johnson met with then-State Senator Michael Kehoe, now Governor of Missouri and a Defendant in this action. The appeal was made against the backdrop of the Governor's announced reduction of more than $56 million in state support for higher education. Through that advocacy, the State of Missouri, including the Defendant Governor personally, received actual notice from Lincoln's own alumni leadership of the unmet land-grant matching obligation more than six years before the Secretaries' letter of September 18, 2023.

27. During her presidency, Ms. Johnson documented the institutional consequences of underfunding in real time. In 2014, Lincoln University de-registered students from eight states, including Missouri, for unpaid balances totaling $142,530.13 that the institution could not absorb; alumni chapters, including under Ms. Johnson's leadership, raised funds to reinstate them. In July 2013, Lincoln eliminated thirteen positions, including faculty positions in chemistry, physics, biology, English, and special education, a mental health counselor, and a farm outreach worker, the

last a land-grant extension position that the federal funds at issue in this case are appropriated to support.

28. Ms. Johnson's injury is continuing. The value of her degree depends on the standing of the institution that conferred it, and that standing remains diminished so long as Missouri continues to fund Lincoln below the level federal law requires. She remains actively engaged with the institution as an alumni officer, and the institution's continued incapacity to provide the facilities, faculty, and support her own education lacked is an ongoing injury to her that prospective relief would redress.

29. Ms. Johnson brings this action to secure redress for her own injury and so that the students she has recruited to Lincoln do not experience what she experienced. She is willing to be publicly identified as a named plaintiff, to provide deposition testimony, and to testify at trial. She has retained records from her alumni leadership, including correspondence, notes, and photographs, which she will produce in discovery. She will execute FERPA and other releases as required.

**Plaintiff Makhi Joseph Berinyuy Jaff**

30. Plaintiff Makhi Joseph Berinyuy Jaff is a natural person born on January 14, 2005. He attended Lincoln University of Missouri beginning in August 2023, majoring in Journalism, and departed the institution in December 2024 without completing his degree.

31. Plaintiff Jaff enrolled at Lincoln University as a first-year student in the Fall 2023 semester. During his enrollment, he served as SGA Freshman Class President and as President of the NAACP Lincoln University Chapter. He received scholarship assistance and lived on campus in Perry Hall during his freshman year and later in Sherman Hall.

32. Missouri's failure to provide equitable matching funds to Lincoln University resulted in $361,569,760 in funds legally owed to Lincoln University but never appropriated, as calculated by the United States Secretaries of Agriculture and Education using federal IPEDS data and transmitted to Missouri's Governor on September 18, 2023. Other states facing similar 1890

under-match claims have resolved comparable obligations. Mississippi resolved its obligations for $503 million through the *Ayers v. Fordice* consent decree in 2002. Maryland reached a $577 million legislative settlement in 2021 resolving its HBCU equity litigation. Missouri has taken no remedial action.

33. Beyond the per-student funding shortfall, Missouri's failure to provide the required statutory match forced Lincoln University to divert approximately $43.5 million from its own core general operating budget between fiscal year 2000 and fiscal year 2016 to subsidize the State's matching obligation, funds that were thereby unavailable for faculty hiring, student support services, facilities maintenance, advising infrastructure, and academic program development. The land-grant funds that Lincoln preserved through this diversion are restricted by federal law to agricultural program use. Lincoln was therefore doubly harmed: its general operating capacity was depleted, and the replacement funds it preserved were categorically restricted from addressing the broader institutional needs the diverted money would have funded. The institution Plaintiff Jaff enrolled in was structurally depleted not because of its own choices but because the State of Missouri compelled it to self-cannibalize for sixteen years.

34. In years when Lincoln University could not cover the required state match from its own depleted general fund and could not sustain a waiver, Lincoln was compelled to return federal land-grant allocations already earmarked for Missouri to the United States Department of Agriculture's National Institute of Food and Agriculture ("USDA/NIFA"). Missouri's own Office of Administration budget documentation for the Lincoln University Land-Grant Match appropriation, House Bill Section 3.225, confirms that Lincoln returned $2,502,563 in federal funds in fiscal year 2016, $2,777,360 in fiscal year 2017, and $2,692,913 in fiscal year 2018, totaling $7,972,836 in forfeited federal allocations across those three documented years alone. These were not discretionary returns. They were compelled forfeitures of Congressional appropriations, lost permanently because Missouri refused to provide the state match the law required.

35. During his enrollment, Plaintiff Jaff personally documented the conditions of Lincoln University's physical plant, housing, dining services, academic facilities, and student support infrastructure. His documentation includes photographs, student interviews, and written analysis presented in a twenty-five slide presentation titled "The Effect of Underfunding," prepared in 2024 and 2025, a true and correct copy of which is attached to this Complaint as Exhibit A and incorporated by reference.

36. The conditions Plaintiff Jaff documented and personally experienced include: Perry Hall, a co-ed dormitory built in 1963, suffering from leaking plumbing that caused fecal matter to disperse throughout the building when pipes burst, inadequate and cold water, faulty water pressure, and a complete absence of functional study or recreation spaces; Sherman Hall experiencing persistent water pressure failures; campus-wide WiFi failures across multiple residence halls; Richardson Auditorium, the Fine Arts Center constructed in 1956, featuring aging stage curtains secured with duct tape, a sound system on the verge of failure, electrical wiring not in accordance with current safety regulations, deteriorated flooring, and rope rigging in poor condition; art department classrooms and music practice rooms with exposed pipes, broken brick walls, outdated and unusable computers, broken furniture, and spaces that do not receive cleaning services; a campus cafeteria providing consistently low-nutritional food with high sodium content, undercooked meat, and weekend menus that eliminated fresh fruits and vegetables entirely; and a Thompkins Health Center lacking sufficient staff and resources to address the mental health needs of the student population.

37. Plaintiff Jaff interviewed multiple Lincoln University students and former residents of Perry Hall for his documentation project. A former Perry Hall resident reported that only two showers were available for a floor full of students, the bathroom was consistently in disrepair, and hot water failed during winter months. Another former resident confirmed that only one shower was in working condition, and even that shower had persistently low water pressure. A student interviewed regarding dining reported that a full health evaluation revealed missing vital nutrients traceable to reliance on the campus cafeteria for daily meals.

38. Plaintiff Jaff reported facility conditions to Lincoln University staff, including a head chef, during his first semester in 2023. No adequate remediation occurred. He possesses photographs and video documentation of the conditions described herein.

39. The conditions Plaintiff Jaff experienced and documented are not isolated incidents. They are the predictable and foreseeable consequence of Missouri's decades-long failure to provide equitable matching funds to Lincoln University. Missouri's underfunding produced an institution whose CBHE performance metrics, including student retention rates and 24-credit-hour completion rates, reflect the absence of adequate student support services, advising capacity, facilities, and academic infrastructure that adequate funding would have provided. The CBHE system then penalized Lincoln financially for the lower performance rates that the underfunding itself produced, reducing the funds available to address the very conditions responsible for those rates. Plaintiff Jaff's own departure from Lincoln University without a degree is evidence of the retention harm the underfunding produced. As Plaintiff Jaff himself documented: "Lincoln is constantly putting bandaids over bullet wounds because they do not have the resources to fully address the blow."

40. Plaintiff Jaff departed Lincoln University in December 2024 without completing his degree, citing entry into the workforce. He is currently employed at a wage of $15 per hour. His departure from Lincoln University without a degree, and his current employment at a wage below what a completed college education is designed to produce, constitute direct and ongoing economic injury caused by Missouri's failure to fund Lincoln University equitably.

41. Plaintiff Jaff's injury is concrete, particularized, and actual. It is directly and causally traceable to Missouri's decades-long failure to provide the state matching funds required under 7 U.S.C. § 3222d and constitutionally required under the Equal Protection Clause, not to independent institutional decisions by Lincoln University. Missouri's withholding of $361,569,760 in required matching funds produced the deteriorated facilities, limited student support services, constrained advising capacity, and reduced program offerings that Plaintiff Jaff experienced during his enrollment. Missouri's further compulsion of Lincoln to divert $43.5 million in core operating

funds to subsidize the State's own matching obligation structurally depleted the institution's capacity to support student retention and completion before Plaintiff Jaff arrived on campus. His injury is personal to him and is redressable by compensatory damages measured by his own educational and economic loss.

42. Plaintiff Jaff's injury is continuing. He departed Lincoln without a degree because the institution as Missouri had funded it could not sustain his enrollment, and he remains without that degree. His present earnings reflect that ongoing consequence. Should Lincoln be restored to the institutional capacity that adequate funding would provide, the opportunity to complete his degree at a fit institution would be restored to him. Prospective relief that restores Lincoln's capacity would redress that continuing injury.

43. Plaintiff Jaff is willing to be publicly identified as a named plaintiff, to provide deposition testimony, and to testify at trial. He has identified witness Brandon Sewell and will provide transcripts, photographs, and videos in discovery. He will execute FERPA and medical releases as required.

**Plaintiff Aaliyah Harris**

44. Plaintiff Aaliyah Harris is a natural person born on June 2, 2006. She is twenty years of age and competent to testify to the matters stated herein. Her permanent residence is in Newnan, Georgia. During the academic year she resides on the campus of Lincoln University in Jefferson City, Missouri, in Sherman Hall.

45. Ms. Harris enrolled at Lincoln University as a first-year student in January 2025. She is a full-time sophomore majoring in Agriculture with a minor in Animal Science, and she expects to complete approximately sixty credit hours by the end of the Fall 2026 semester. She expects to graduate in December 2028. She has earned a 3.7 grade point average and has been named to the Dean's List in every semester of her enrollment.

46. Ms. Harris attends Lincoln with the support of two institutional scholarships, including the David Scott Scholarship in the amount of $6,000 per semester and a second

scholarship in the amount of $1,400 per semester. She receives no financial aid from the State of Missouri. Her coursework in the agriculture program includes laboratory instruction in plant and soil science, chemistry, and biology, for which she depends on the University's laboratory facilities.

47. Ms. Harris is enrolled in the land-grant program that the federal funds at issue in this action were appropriated to support. The faculty teaching in that program are few in number. The University's student health center operates by appointment only and is staffed by a single nurse for the campus.

48. Ms. Harris lives in Sherman Hall, the same residence hall in which Plaintiff Jaff documented persistent water pressure failures during the 2023 and 2024 academic years. In her own residence there she has found mold in the shower and in the ventilation ducts, and accumulated trash and unsanitary conditions in the building. The campus dining facility's hours of operation on weekends do not meet the needs of students, and Ms. Harris regularly spends her own money on groceries, feminine hygiene products, and other necessities that the University does not adequately provide. When she has visited Columbia, Missouri, she has observed that the University of Missouri's buildings are maintained to a standard that Lincoln's are not and that its students have food options that Lincoln's do not.

49. In Ms. Harris's own words: "We are paying a lot of money for a school that is not clean. I blame the State of Missouri for this because it is their job." Were Missouri to fund Lincoln as it funds the University of Missouri, she would, in her words, "feel cared for by the school," have adequate food, and not be required to spend her own money to make up what the institution cannot provide.

50. Ms. Harris's injury is present, concrete, and particularized, and it is ongoing. She lives today in facilities that the State's violation left in disrepair, she pays today out of her own pocket for necessities the State's violation left the University unable to provide, and she pursues her degree today in a program whose faculty and laboratory capacity the State's violation diminished. Because she is currently enrolled and will remain enrolled for more than two academic years, she

faces a real and immediate threat of continued injury, not merely the consequence of past exposure, and the prospective declaratory and injunctive relief sought in this action would redress that injury directly. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Her injury is traceable to Defendants' conduct and not to independent decisions of the University, for the reasons set forth in Section B below.

51. Ms. Harris has no family member employed by Lincoln University, the State of Missouri, the University of Missouri System, or the federal government. She has never been the subject of a disciplinary proceeding, academic probation, or a registration or financial hold. She is willing to be publicly identified as a named plaintiff, to provide deposition testimony, and to attend a hearing or trial in Jefferson City. She will execute FERPA and other releases as required.

**Plaintiff Shakiya Rihanna Kimble**

52. Plaintiff Shakiya Rihanna Kimble is a natural person born on October 18, 2005. She is twenty years of age and competent to testify to the matters stated herein. Her permanent residence is in Lithonia, Georgia. During the academic year she resides on the campus of Lincoln University in Jefferson City, Missouri, in Bennett Hall.

53. Ms. Kimble enrolled at Lincoln University as a first-year student in August 2024. She is a full-time junior carrying eighteen credit hours in the Fall 2026 semester, majoring in Plant and Soil Science within the agriculture program, the land-grant program that the federal funds at issue in this action were appropriated to support. She expects to graduate in May 2028. She has earned a 3.3 grade point average and was named to the Dean's List in the fall and spring semesters of her first year and the spring semester of her second. She serves as Vice President and Secretary of the Lincoln chapter of Zeta Phi Beta Sorority, Inc., and as Community Service Chair of the University's National Pan-Hellenic Council.

54. Ms. Kimble chose Lincoln because of the history on which it was founded, and, in her words, because that history "made me believe that I could do the exact same thing but in my field."

55. Ms. Kimble enrolled at Lincoln in reliance on a scholarship that she understood would cover the full cost of her attendance. That scholarship was subsequently withdrawn. For the current academic year her aid consists of a Federal Pell Grant of $9,244, a David Scott Scholarship of $6,011.90, a tuition discount waiver of $8,706, a subsidized federal loan of $376, and an unsubsidized federal loan of $7,000. She works twenty to thirty hours per week at an off-campus restaurant to meet the cost of her room and board. In her words: "My full ride scholarship was taken away and now it left me struggling to pay for my room and board. Even though it was promised to help me financially in the long run, now I'm pulling loans." Were Missouri to fund Lincoln as it funds the University of Missouri, she would expect the University to be able to offer the scholarship support that would have kept her from borrowing, and, in her words, "possibly give me back my original fully paid scholarship instead of paying out of pocket."

56. Ms. Kimble has experienced the consequences of the University's limited advising capacity directly. When the University reassigned her to the adviser responsible for her major, that adviser disputed the minor her prior adviser had approved and told her it had not cleared, after she had already arranged her course sequence around it so that it would not delay her graduation. She does not know how many faculty teach in her program. She has used the University's health services and found them of limited help, and found that a student without insurance has difficulty obtaining care on campus depending on the service sought.

57. Ms. Kimble lives in Bennett Hall, a residence hall the University has maintained, and she returns to it each year for that reason. Her injury is not the condition of her housing. It is the withdrawal of the scholarship on which she enrolled, the debt and the working hours she carries in its place, the advising she has received, and the health services available to her, each of which the State's failure to fund Lincoln at the level federal law requires has produced or made worse. That

different currently enrolled students experience the consequences of the State's violation in different parts of their education is itself evidence of how pervasive those consequences are.

58. Ms. Kimble's injury is present, concrete, and particularized, and it is ongoing. She borrows today, works today, and pursues her degree today in a program whose advising and student-support capacity the State's violation diminished, and she will remain enrolled through May 2028. She faces a real and immediate threat of continued injury rather than the consequence of past exposure, and the prospective declaratory and injunctive relief sought in this action would redress that injury directly. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Her injury is traceable to Defendants' conduct and not to independent decisions of the University, for the reasons set forth in Section B below.

59. Ms. Kimble has no family member employed by Lincoln University, the State of Missouri, the University of Missouri System, or the federal government. She has never been the subject of a Lincoln disciplinary proceeding, academic probation, or a registration or financial hold. She is willing to be publicly identified as a named plaintiff, to provide deposition testimony, and to attend a hearing or trial in Jefferson City. She has her enrollment records and financial aid award letters and will produce them in discovery, and she will execute FERPA and other releases as required.

**Plaintiff LaRon Jones**

60. Plaintiff LaRon Jones is a natural person born on March 22, 2006. He is twenty years of age and competent to testify to the matters stated herein. He is from Atlanta, Georgia, and during the academic year he resides on the campus of Lincoln University in Jefferson City, Missouri, in Tull Hall.

61. Mr. Jones enrolled at Lincoln University as a first-year student in the Fall 2024 semester. He is a full-time junior majoring in Agricultural Business, and he expects to graduate in 2028. He has earned a 3.0 grade point average and has been named to the Dean's List three times.

He receives no financial aid, works off campus to meet his expenses, and during the summer of 2026 considered leaving Lincoln because he could not cover the cost of attendance.

62. Mr. Jones is enrolled in the land-grant program that the federal funds at issue in this action were appropriated to support, and he performs laboratory work weekly at the Dickerson Research Center, a facility of Lincoln's 1890 land-grant research program. He is a member of Kappa Alpha Psi Fraternity, Inc., serves on the Campus Activities Board, competes in track and field, and has represented the University as Mr. Sophomore and on the Alpha Kappa Alpha king's court.

63. Mr. Jones has experienced the consequences of the State's underfunding in his program and his daily life. Required courses for the Agricultural Business degree have at times been unavailable when he needed them, forcing him to schedule around course availability rather than through his degree plan. The classrooms, technology, and agricultural facilities on which his major depends are, in his words, "outdated compared with what I would expect from a university," and limited resources deny Lincoln students the hands-on and academic experience that students at larger Missouri universities receive. Housing and dining services have at times fallen short of what students pay for, and dining hours do not accommodate students who work. Campus support services require repeated follow-up to obtain help. He has had to be, in his words, "very conscious of my money because I do not want to take on unnecessary debt," and when campus resources are limited he and other students pay for substitutes themselves.

64. In Mr. Jones's own words: "Being a student at Lincoln can sometimes feel like you have to figure things out yourself when resources or support are limited. When you are already balancing classes, work, organizations, and financial responsibilities, having to constantly follow up or find your own solutions adds another burden. It affects your time, money, and ability to focus on school." He knows students at other Missouri public universities and has observed that they have more resources, larger departments, more course options, and more facilities. Were Missouri to fund Lincoln as it funds the University of Missouri, he would, in his words, have "more

resources available to succeed in Agricultural Business without constantly having to work around limitations."

65. Mr. Jones's injury is present, concrete, and particularized, and it is ongoing. He pursues his degree today in a land-grant program whose faculty, course offerings, and facilities the State's violation diminished, he works today to cover costs that adequate institutional resources would have reduced, and he will remain enrolled for approximately two academic years beyond the current one. He therefore faces a real and immediate threat of continued injury, not merely the consequence of past exposure, and the prospective declaratory and injunctive relief sought in this action would redress that injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

66. Mr. Jones has no family member employed by Lincoln University, the State of Missouri, the University of Missouri System, or the federal government. He has never been the subject of a disciplinary proceeding, academic probation, or a registration or financial hold, and he has no pending or past legal matters. He has not spoken with any reporter or posted publicly about Lincoln's funding. He is willing to be publicly identified as a named plaintiff, to provide deposition testimony, and to attend a hearing or trial in Jefferson City. He will execute FERPA and other releases as required.

**Plaintiff Jaydan Monee Ware**

67. Plaintiff Jaydan Monee Ware is a natural person born on May 14, 2007. She is nineteen years of age and competent to testify to the matters stated herein. She is from Stone Park, Illinois, and during the academic year she resides on the campus of Lincoln University in Jefferson City, Missouri, in Martin Hall.

68. Ms. Ware enrolled at Lincoln University as a first-year student in the Fall 2025 semester. She is a full-time sophomore carrying sixteen credit hours, pursuing a Bachelor of Science in Computer Information Systems and an Associate of Science in Computer Science, and

she expects to graduate in May 2028. She earned a place on the Dean's List in the Fall 2025 semester. She finances her education with a Pell Grant, two Lincoln scholarships, and federal student and parent loans. She serves as Treasurer of the Executive Board of the Student Government Association for the 2026 to 2027 academic year and is a member of the Lincoln University Marching Band.

69. Ms. Ware has experienced the consequences of the State's underfunding from her first week on campus. When she arrived in August 2025, the residence hall to which incoming band students were ordinarily assigned was not open, and she was placed in Tull Hall, where the ventilation in her room was visibly dirty and where she experienced respiratory and allergic symptoms she had never before experienced; she purchased an air purifier at her own expense and incurred an emergency room bill exceeding one thousand dollars for treatment of an allergic reaction during that period. She could not enroll in CS 101, the introductory course for her major, because the single section offered was full, and she takes it now alongside her advanced coursework. Lincoln assigned her a first-year adviser although the University knew she would reach sophomore standing in her second semester, reassigned her only weeks before the end of the academic year, and the delay prevented her from registering for courses and housing on schedule. Campus internet service fails often enough that she exceeds her cellular data allowance each month to submit coursework. The University's disability services office did not implement accommodations for a documented medical condition until a new coordinator was hired, and did not communicate her needs to the housing office.

70. Dining hours and food quality have imposed direct costs on Ms. Ware. When the late-night dining option was closed, she and other band members could not obtain dinner after evening practice, and the limited hours and limited variety of the dining hall caused her to lose approximately fifteen pounds in her first semester. During band camp in each of the past two years, when dining hours were further reduced, she spent approximately two hundred dollars of her own money to eat after practice.

71. In Ms. Ware's own words: "I appreciate the HBCU aspect of my school, and being around people who look like me. But for how much money it costs to attend LU I find the quality of this institution to be very subpar." She has a cousin enrolled at the University of Missouri and has seen that institution's dining facilities, residence halls, student events, and band and athletic programs firsthand; in her words, "I can see how much more funding they have than us." Were Missouri to fund Lincoln as it funds the University of Missouri, she would, in her words, "live somewhere where I don't have to worry about eating, or mold in my vents."

72. Ms. Ware's injury is present, concrete, and particularized, and it is ongoing. She lives, eats, and studies today in facilities the State's violation left in their present condition, she pays today for food and equipment that adequate institutional resources would have provided, and she will remain enrolled for approximately two academic years beyond the current one. She therefore faces a real and immediate threat of continued injury, not merely the consequence of past exposure, and the prospective declaratory and injunctive relief sought in this action would redress that injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Northeastern Florida Chapter of Associated General Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

73. Ms. Ware has no family member employed by Lincoln University, the State of Missouri, the University of Missouri System, or the federal government. She has never been the subject of a disciplinary proceeding, academic probation, or a registration or financial hold, and she has no pending or past legal matters. She has not spoken with any reporter or posted publicly about Lincoln's funding. She is willing to be publicly identified as a named plaintiff, to provide deposition testimony, and to attend a hearing or trial in Jefferson City. She will execute FERPA and other releases as required.

**Defendants**

74. Defendant THE STATE OF MISSOURI is a sovereign state of the United States. It is named as a Defendant on the Title VI claim, as to which Congress has expressly abrogated

Eleventh Amendment immunity, 42 U.S.C. § 2000d-7(a)(1), and as to which the State is a recipient of federal financial assistance within the meaning of 42 U.S.C. § 2000d.

75. Defendant THE COORDINATING BOARD FOR HIGHER EDUCATION ("CBHE") of the State of Missouri was established by a 1972 constitutional amendment and the Omnibus State Reorganization Act of 1974. CBHE is responsible for overseeing allocation of public funds to higher education institutions in Missouri, including Lincoln University. CBHE has implemented a criteria-based matching fund mechanism applicable to Lincoln University but not applied in equivalent form to the University of Missouri. CBHE is a recipient of federal financial assistance and is named on the Title VI claim.

76. Defendant GOVERNOR MICHAEL KEHOE is named in his official capacity as Governor of Missouri. The Governor is responsible for executing and enforcing state law, including the laws governing appropriations to higher education, holds the power to withhold appropriated funds, and has personally received notice of the unmet land-grant matching obligation, including through the alumni advocacy of February 8, 2017 at which he was present as a State Senator. He is named for purposes of prospective declaratory and injunctive relief under *Ex parte Young*.

77. Defendant DR. BENNETT BOGGS is named in his official capacity as Commissioner of Higher Education and Workforce Development of the State of Missouri. The Commissioner is the chief executive officer of the Department of Higher Education and Workforce Development, which administers the Coordinating Board for Higher Education and the criteria-based funding mechanism applied to Lincoln University's statutory matching funds. The Commissioner has the authority to administer, modify, or discontinue that mechanism, and is named for purposes of prospective declaratory and injunctive relief under *Ex parte Young*.

78. Defendant DR. MUN Y. CHOI is named in his official capacity as President of The University of Missouri System. He oversees the State's 1862 land-grant institution, whose receipt of state matching funds without criteria-based conditions is the comparator against which the discriminatory treatment of Lincoln University is measured, and he participates in the statewide

allocation of higher education resources. He is named for purposes of prospective declaratory and injunctive relief under *Ex parte Young*.

**HISTORY OF THE LAND-GRANT UNIVERSITY SYSTEM**

79. In 1862, President Abraham Lincoln signed the First Morrill Act, establishing the 1862 land-grant universities with endowment funding, federal land grants, and perpetual financial support. The First Morrill Act allocated over 100 million acres of land to the states. Black students were excluded from these institutions.

80. The Second Morrill Act of 1890, 7 U.S.C. § 3222 et seq., established Black land-grant universities with missions similar to those of the 1862 institutions, requiring states to establish a "just and equitable division" of monies between 1862 and 1890 institutions as a condition of receiving federal funds.

81. The nature of the federal matching obligation changed over the harm period, and Plaintiffs plead it with precision. From the enactment of the Second Morrill Act in 1890 through fiscal year 1999, federal law required states accepting 1890 land-grant funds to provide a "just and equitable division" of funds between their 1862 and 1890 institutions as a condition of acceptance, without prescribing a specific dollar formula. The Agricultural Research, Extension, and Education Reform Act of 1998 (AREERA), Pub. L. No. 105-185, codified the specific dollar-for-dollar state matching requirement at 7 U.S.C. § 3222d, effective beginning fiscal year 2000 and phasing to a full one-hundred-percent match by fiscal year 2007. For the period 1987 through 1999, Missouri's obligation arose under the original Second Morrill Act's "just and equitable division" condition. The per-student funding disparity documented herein is actionable for every year from 1987 through 2020 under the Equal Protection and Title VI theories pleaded below, regardless of the effective date of the § 3222d formula, because the constitutional and Title VI violations do not depend on the statutory formula but on Missouri's continuing failure to eliminate the vestiges of its de jure system.

82. From 1987 to 2020, sixteen of the nineteen states with designated 1890 institutions failed to provide equitable state funding to their 1890 land-grant institutions. Two states, Delaware and Ohio, equitably funded their institutions throughout the period and received no letter from the federal government. The federal government, using IPEDS and National Center for Education Statistics data, calculated the aggregate underfunding nationally at approximately $12.6 billion over this period, transmitted directly to sixteen governors on September 18, 2023 by the Secretaries of Agriculture and Education.

83. Resource disparities between 1862 and 1890 institutions persist to the present day. Research expenditures per full-time equivalent student are nearly three times greater at 1862 institutions ($10,774 versus $3,388 at 1890 institutions). Endowments per full-time equivalent student are six times greater ($77,103 versus $12,532). In 2019 to 2020, 1862 institutions operated with $2 billion more in total revenues than 1890 institutions. *Nourishing the Nation While Starving*, The Century Foundation (2023). These are active, present-day structural inequalities that Plaintiff Jaff experienced directly during his enrollment in 2023 and 2024.

84. Two states have resolved HBCU equity litigation through negotiated resolution, establishing the administrative precedent for consent decree resolution of such claims. Mississippi resolved its claims through the *Ayers* consent decree in 2002 for $503 million, concluding decades of litigation under *Ayers v. Fordice* in the Northern District of Mississippi. Maryland reached a $577 million legislative settlement in 2021 resolving a fifteen-year HBCU equity lawsuit concerning program duplication. Missouri has taken no remedial action and has never operated its public higher education system under a judicially supervised decree addressing its 1890 land-grant funding obligations.

## HISTORY OF MISSOURI'S PUBLIC HIGHER EDUCATION SYSTEM AND PATTERN OF DELIBERATE INADEQUACY

85. Missouri founded the University of Missouri in 1839 as a white-only institution, which did not admit its first Black undergraduate student until 1950. In 1862, it received 1862 land-

grant designation with the perpetual federal support and land endowment that Lincoln University never received.

86. In 1866, freed Black soldiers of the 62nd and 65th United States Colored Infantry founded Lincoln Institute, designed for the special benefit of emancipated African Americans. Lincoln Institute received state funding beginning in 1870, federal designation under the Second Morrill Act in 1890, and became Lincoln University in 1921. It is one of only two land-grant universities in Missouri.

87. Missouri's history of responding to legal mandates for Black educational equality with deliberate inadequacy is documented at the Supreme Court level. In *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938), the Supreme Court held that Missouri violated the Equal Protection Clause by funding law school education for Black residents at out-of-state institutions rather than providing equal access within Missouri. Rather than integrate the University of Missouri Law School, Missouri's legislature responded by appropriating $200,000 to Lincoln University to establish a separate Black law school. That institution was housed in the former site of a cosmetic school alongside a movie theater and a hotel. It enrolled approximately thirty students and did not begin to approach the quality of the University of Missouri Law School. Missouri chose deliberate inadequacy over genuine equality. This same pattern, using formally compliant but materially inadequate appropriations to satisfy legal obligations while preserving the structural advantages of predominantly white institutions, has continued for over a century, most recently in Missouri's use of the CBHE criteria system to withhold matching funds from Lincoln University that are owed as a matter of federal law.

88. Missouri's obligation to desegregate its higher education system is affirmative, continuous, and traceable to its pre-*Brown* de jure system. This obligation was never discharged by Missouri's inclusion among the eight states that the Department of Education's Office for Civil Rights found in compliance with Title VI in the late 1980s based on implementation of OCR-approved desegregation plans. As the Department of Education expressly reaffirmed in its January 31, 1994 Federal Register notice issued in response to *Fordice*, all states with a history of de jure

segregated systems of higher education, including those released from their OCR-approved plans, retain an affirmative duty to ensure that no vestiges of the de jure system are having a discriminatory effect on the basis of race. Notice of Application of Supreme Court Decision, 59 Fed. Reg. 4277 (Jan. 31, 1994). Every step toward equality in Missouri's higher education system has required external legal compulsion, and even then, Missouri has responded with the minimum required rather than genuine parity.

## DEFENDANTS' VIOLATIONS OF FEDERAL LAW AND CONSTITUTIONAL OBLIGATIONS

### *A. Missouri's Affirmative Duty to Desegregate*

89. Missouri has a constitutional obligation, confirmed by the Supreme Court in *United States v. Fordice*, 505 U.S. 717 (1992), and *Green v. County School Board of New Kent County*, 391 U.S. 430 (1968), to affirmatively dismantle the vestiges of its prior de jure segregated system of higher education and to eliminate policies and practices traceable to that system that continue to have discriminatory effects. Race-neutral policies alone do not discharge this obligation.

90. The HEW Revised Criteria, 43 Fed. Reg. 6658 (February 15, 1978), identify specific affirmative obligations of former de jure states, including enhancement of historically Black institution quality and elimination of program duplication. Missouri has not satisfied these obligations with respect to Lincoln University.

91. The Department of Education reaffirmed in January 1994 that all states with a history of de jure segregated systems of higher education, expressly including the eight states that OCR previously found in compliance based on implementation of their desegregation plans, retain an affirmative duty under the Equal Protection Clause and Title VI to ensure that no vestiges of the de jure system are having a discriminatory effect on the basis of race. 59 Fed. Reg. 4277 (Jan. 31, 1994). OCR's earlier finding of compliance did not constitute a determination that Missouri had eliminated all vestiges of its prior de jure system or that its ongoing funding of higher education institutions satisfied *Fordice*'s affirmative dismantlement standard.

92. No judicially approved plan for achieving desegregation of Missouri's higher education system has been implemented under the *Fordice* standard. Missouri's failure to match 1890 funds constitutes a continuing failure of its affirmative desegregation obligation. *See Geier v. Alexander*, 801 F.2d 799 (6th Cir. 1986); *Knight v. Alabama*, 14 F.3d 1534 (11th Cir. 1994).

***B. Missouri's Systematic and Intentional Underfunding of Lincoln University***

93. Missouri violated the constitutional rights of Plaintiffs in each year from 1987 to 2020 by appropriating state funds to Lincoln University at a per-student level below that appropriated to the University of Missouri, and, from fiscal year 2000 forward, by failing to match federal 1890 land-grant funds allocated to Lincoln University with state funds on a dollar-for-dollar basis as 7 U.S.C. § 3222d requires.

94. Missouri's failure resulted in $361,569,760 in funds legally owed to Lincoln University but never appropriated. This figure is the federal government's own calculation, computed by the United States Secretaries of Agriculture and Education using IPEDS data comparing per-student state appropriations to Lincoln University versus the University of Missouri, and transmitted in writing to Missouri's Governor on September 18, 2023. Plaintiffs have independently replicated that calculation from the underlying public IPEDS data and reproduced the federal figure to within three dollars across thirty-four years. That replication, showing for each fiscal year from 1987 through 2020 the State's appropriation to each institution, each institution's fall enrollment, the resulting appropriation per student, the per-student gap, the annual shortfall, and the running cumulative shortfall, is submitted herewith as Exhibit C. All dollar figures in Exhibit C, and the $361,569,760 total, are stated in constant 2020 dollars, as in the federal dataset. Missouri's treatment of the state matching obligation as a discretionary annual legislative appropriation rather than a mandatory state legal obligation does not diminish the State's legal duty or provide a defense to the documented failure.

95. Exhibit C makes the disparity visible year by year. In fiscal year 1987, the first year of the harm period, the State appropriated $11,489 per student to the University of Missouri and $7,625 per student to Lincoln University. The gap widened through the early 1990s as Lincoln's

enrollment grew and its appropriation did not: in fiscal year 1991 the State appropriated $10,947 per University of Missouri student and $4,736 per Lincoln student, less than half, producing a single-year shortfall of $25,473,492. The per-student gap exceeded $5,000 in nine of the eleven fiscal years from 1990 through 2000 and peaked at $6,274 per student in fiscal year 1993. The cumulative shortfall passed $100 million in fiscal year 1992, passed $250 million in fiscal year 2000, and reached $373.6 million in fiscal year 2016. The State's per-student appropriation to the University of Missouri exceeded its per-student appropriation to Lincoln University in thirty of the thirty-four fiscal years in the harm period, and in absolute dollars the State appropriated between ten and fourteen times as much to the University of Missouri as to Lincoln University in every one of those years. Net of the reversal described in Section B below, the cumulative shortfall for the harm period is $361,569,763, which is the federal figure.

96. Lincoln University's own matching-fund worksheet, reconciled to the federal award and state appropriation for each fiscal year from 2000 through 2024 and submitted herewith as Exhibit B, records the State's performance against the statutory match year by year. Missouri provided no state matching funds to Lincoln's 1890 land-grant program for the entirety of fiscal years 2000 through 2007, while the required match rose from $1,210,097 to $5,378,907. From fiscal year 2008 through fiscal year 2014, the State appropriated between $771,824 and $873,000 annually, net of the statutory reserve, against required matches of $5.46 million to $7.07 million: between eleven and sixteen percent of the obligation. In fiscal years 2015 and 2016, the State appropriated $1,287,524 and $1,297,095, approximately eighteen percent of the required match of approximately $7.1 million. In fiscal year 2017, the legislature appropriated $2 million for the match, Governor Jay Nixon withheld $1 million, and the State's net contribution was $1,734,502, approximately twenty-four percent. The State's share rose to approximately forty-five percent in fiscal year 2018, reached fifty-one percent in fiscal year 2019, and fell back to forty-four and forty percent in fiscal years 2020 and 2021. By contrast, Missouri fully matched the University of Missouri's federal land-grant allocations in every year of the same period without exception, without seeking a waiver, and without requiring the University of Missouri to subsidize the State's

obligation from its own operating funds. The complete year-by-year record of Lincoln's federal allocations, state appropriations, and any waivers granted for each fiscal year from 1987 through 2020 is in the custody of Defendants and subject to discovery.

97. Missouri's failure to appropriate the required state match did not merely leave a gap in Lincoln University's funding. It forced Lincoln to cannibalize its own core institutional operating budget to survive. From fiscal year 2000 through fiscal year 2016, Lincoln University spent $43,496,718 from its own general operating fund to subsidize the state matching obligation that Missouri refused to appropriate, in order to preserve access to federal land-grant allocations earmarked for Missouri. Those general operating funds could not be replaced by the federal land-grant funds they were used to access, because federal land-grant funds are restricted by law to agricultural program use. The deferred maintenance, understaffed advising offices, limited student support services, and constrained academic programs that Plaintiffs experienced during their respective enrollments are the direct downstream consequences of that compelled institutional cannibalization.

98. In years when Lincoln University could not cover the required state match from its own depleted general fund and could not sustain a waiver, Lincoln was compelled to return federal land-grant allocations already earmarked for Missouri to USDA/NIFA. Missouri's own Office of Administration budget documentation for the Lincoln University Land-Grant Match appropriation, House Bill Section 3.225, confirms that Lincoln returned $2,502,563 in federal funds in fiscal year 2016, $2,777,360 in fiscal year 2017, and $2,692,913 in fiscal year 2018, totaling $7,972,836 in documented forfeited federal allocations across those three years alone. In every other year from fiscal year 2000 through fiscal year 2024 in which neither the State nor the University covered the full match, Lincoln applied to USDA/NIFA for a waiver of the unpaid balance, disclosing in each application that the State of Missouri had not appropriated the required funds. Across fiscal years 2000 through 2024, the portion of the required match that was paid by neither the State nor the University, and was instead waived or forfeited, totaled approximately $65,784,322. Missouri's failure therefore did not merely withhold state funds from Lincoln University. It caused Lincoln to

forfeit federal funds as well, compounding the total institutional deprivation beyond the per-student shortfall calculated in the Secretaries' letter.

99. Upon information and belief, Lincoln University also incurred indebtedness during the harm period to finance capital projects, deferred maintenance, and operating needs that the State's matching funds, had they been appropriated, would have covered. The debt service on those obligations has further reduced the resources available to the institution and its students in each year since, and constitutes a continuing consequence of the State's violation. The instruments, amounts, and purposes of that indebtedness are reflected in Lincoln University's audited financial statements and are subject to discovery.

100. Missouri's own conduct confirms that its decades of non-compliance were a matter of choice, not fiscal incapacity. Beginning with the appropriation enacted in May 2022, the State substantially increased its contribution toward Lincoln University's land-grant match for the first time since the federal match was mandated in fiscal year 2000, and publicly characterized that appropriation as the full match. Lincoln University's matching-fund worksheet records that the State's appropriation rose from $4,883,234 in fiscal year 2022 to $9,468,323 in fiscal year 2023 and $10,131,106 in fiscal year 2024. Because the federal allocation to Lincoln rose in the same years, those appropriations equaled approximately eighty-four percent and eighty-two percent of the required match for fiscal years 2023 and 2024, and the unpaid balance for those two years alone was approximately $4 million. Lincoln University's president, John Moseley, has publicly acknowledged the institutional consequence of the preceding decades of non-compliance, stating in October 2023 that when the University was compelled to take money out of its core funding to cover the State's unmet obligation, those funds "could have been used to make sure that our buildings are maintained," and estimating the resulting deferred maintenance on the main campus at approximately $87 million. Annelise Hanshaw, Missouri Lawmakers Push for Study of Lincoln University Funding Inequity, Missouri Independent (Oct. 6, 2023). That the State was able to appropriate nearly $10 million toward the match in fiscal years 2023 and 2024 demonstrates that its

failure to do so in each of the preceding years was not the product of fiscal impossibility but of a sustained choice to underfund its 1890 land-grant institution.

101. Missouri's underfunding was intentional. It was not the incidental result of a race-neutral policy applied evenhandedly. The State fully matched the University of Missouri's land-grant allocations every year without condition while conditioning Lincoln's on performance criteria. The State's own agents at Lincoln University told students in the 1990s that the land-grant money would not come because Lincoln was not the University of Missouri. The State received direct notice of the unmet obligation from Lincoln's alumni leadership in 2017, at an event the present Governor attended, and did not act. The State received the federal government's own calculation of the shortfall in September 2023 and did not act. A pattern of deliberate inadequacy toward Lincoln University that the Supreme Court identified in 1938 in *Gaines* has been sustained through the present, and the sequence of events, the departures from the treatment accorded the comparator institution, and the historical background together establish that Missouri's differential funding of Lincoln University was undertaken with discriminatory purpose. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 to 268 (1977).

102. The consequences of this underfunding are not abstract. Plaintiff Johnson experienced them in the 1990s: unlit stairwells, falling ceiling debris, unsalted stairs on which she fell, broken cafeteria furniture, damaged gymnasium equipment, and the absence of a swimming pool that her degree program required. Plaintiff Jaff documented them in 2023 and 2024: a dormitory built in 1963 with burst sewage pipes and inadequate water infrastructure; a fine arts center constructed in 1956 with electrical wiring not in compliance with current regulations; academic spaces that do not receive cleaning services; and a campus cafeteria providing food of insufficient nutritional quality to support student health. Plaintiff Harris lives with them now: mold in the shower and ventilation of her residence hall, dining hours that leave students to buy their own food on weekends, and a campus health center staffed by one nurse. Plaintiff Kimble carries them in a different form: a scholarship withdrawn, $7,376 in loans and twenty to thirty hours of work a week in its place, and an advising office that could not keep her degree plan straight between two

advisers. Plaintiff Jones works around them: required courses unavailable when his degree plan called for them, outdated facilities and technology in the program the land-grant funds were meant to build, and the summer he nearly left because he could not cover the cost. These conditions exist because Missouri has spent decades withholding the funds that would have addressed them.

103. Missouri's underfunding of Lincoln actively exacerbates segregation, preventing students attending Lincoln from competing on equal footing with students attending predominantly white institutions in Missouri. *Coalition for Equity and Excellence in Maryland Higher Education v. Maryland Higher Education Commission*, 977 F. Supp. 2d 507 (D. Md. 2013). It sustains a structural disadvantage constituting a continuing badge of inferiority traceable to de jure segregation. *Ayers v. Thompson*, 358 F.3d 356 (5th Cir. 2004).

104. In fiscal years 2017 through 2020, the per-student state appropriation figure for Lincoln University nominally exceeded that of the University of Missouri, by $26 per student in fiscal year 2017 and by larger margins thereafter, as Exhibit C shows. This reversal does not reflect any decision by the State to fund Lincoln University equitably, and it does not remediate the cumulative harm alleged herein. The per-student figure is a ratio of state appropriations to enrolled students. During this period the University of Missouri's enrollment declined sharply from its fiscal year 2014 and 2015 peak of approximately 35,400 students to 31,089 students in fiscal year 2020, while Lincoln University's own enrollment fell from 3,349 in fiscal year 2010 to 2,012 in fiscal year 2020, causing the University of Missouri's per-student figure to rise as its enrollment denominator fell. In absolute dollars, the State's appropriations to the University of Missouri exceeded its appropriations to Lincoln University in every fiscal year of the harm period without exception, and by many multiples in each year. The fiscal year 2017 through 2020 per-student convergence is therefore an artifact of enrollment decline at the comparator institution, not evidence of equitable treatment. The federal figure of $361,569,760 already nets those years against the total.

*C. Missouri's Discriminatory Criteria-Based Funding Mechanism*

105. In 2012, CBHE adopted a performance funding model for Missouri's public institutions of higher education, applied beginning in fiscal year 2014, under which each public four-year institution's receipt of performance-based state funding depends on five measures, each worth one-fifth of the funding available. Missouri State Auditor, Department of Higher Education Performance Funding, Report No. 2017-001 (Jan. 2017), at 3 to 5 and Appendix B. The five measures, as the State Auditor records them, are: (1) Student Success and Progress, measured by either the percentage of students who return for the subsequent fall term (Measure 1A) or the percentage of first-time, full-time degree-seeking students completing 24 credit hours in their first two semesters (Measure 1B); (2) Increased Degree Attainment, measured by the total number of awards conferred, with a weight of 1.5 for science, technology, engineering, and mathematics awards (Measure 2A), or an alternative degree attainment measure (Measure 2B); (3) Quality of Student Learning, measured by the percentage of students taking an assessment of general education (Measure 3A), an assessment in the major field (Measure 3B), or a professional or occupational licensure examination (Measure 3C); (4) Financial Responsibility and Efficiency, measured by the percentage of education and general expenditures devoted to the institution's core mission (Measure 4A) or educational revenue per full-time-equivalent student (Measure 4B); and (5) a Mission-Specific measure developed by each institution. Each institution selected one option within each of the first four categories. Performance funding earned in one year becomes part of the institution's core appropriation in the years that follow. Id. at 4.

106. Lincoln University's measures under the model were Measure 1B (24 credit hours in the first two semesters), Measure 2A (awards conferred), Measure 3A (general education assessment) and, in later years, Measure 3C (licensure examinations), Measure 4A (core-mission expenditures), and, as its mission-specific measure for fiscal years 2014 and 2015, "the percentage of students in the freshman cohort who successfully complete English 101 within the first three semesters of enrollment." Id. at Appendix C, 31, and Appendix D, 36. The University of Missouri System's measures were Measure 1A (fall-to-fall retention), Measure 2B, Measure 3C (licensure

examinations), Measure 4A, and, as its mission-specific measure, "federally financed research and development (R&D) expenditures" for fiscal years 2014 through 2016 and "business and industry sponsored R&D expenditures for science and engineering" for fiscal year 2017. Id. at Appendix C, 31, and Appendix D, 37.

107. The results were what the design made inevitable. The State Auditor's Appendix D records that Lincoln University did not earn performance funding on Measure 1B or Measure 2A in fiscal year 2014, and did not earn performance funding on Measure 3C or its mission-specific measure in fiscal year 2015. The University of Missouri System earned performance funding on every one of its five measures in every fiscal year from 2014 through 2017, in most instances by meeting an external peer benchmark. Id. at Appendix D, 36 to 37. The State appropriated $23.5 million in performance funding in fiscal year 2014, $42.1 million in fiscal year 2015, $10.5 million in fiscal year 2016, and $32.5 million in fiscal year 2017. Id. at Appendix A, 28. The State Auditor concluded that the Department's "oversight of some aspects of the PF process has been weak and the lack of comprehensive standards, rules and guidelines have contributed to concerns." Id. at 10.

108. Upon information and belief, during the same fiscal years CBHE and the Department treated Lincoln University's eligibility for state land-grant matching appropriations under 7 U.S.C. § 3222d as contingent on its performance under this model, so that the statutory match the State was already obligated to appropriate was withheld or reduced by reference to the same five criteria, while the University of Missouri's land-grant allocations were appropriated in full without reference to its performance. Plaintiffs challenge the criteria-based mechanism both on its face and as applied to Lincoln University, and seek its elimination as a condition of any state land-grant funding to Lincoln University. The mechanism violates the Equal Protection Clause and Title VI on two independent and cumulative grounds.

109. First, every measure on which Lincoln University was graded is an outcome of institutional resources: whether first-year students complete 24 credit hours, whether they pass English 101 within three semesters, whether they persist to a degree, and whether the institution can afford to spend its education and general budget on its core mission rather than on the State's

unmet obligations. Those outcomes depend on advising, faculty, facilities, and student support, and the State withheld the funding for each of them for decades, including the complete absence of state matching fund appropriations from fiscal year 2000 through fiscal year 2007 and the compelled diversion of $43.5 million in Lincoln's general operating funds to subsidize the State's own statutory obligation. The model then measured Lincoln on those outcomes and withheld funding when they fell short. That is grading the institution on the result of its deprivation. Lincoln's baseline appropriations were themselves the product of Missouri's prior de jure system of racially segregated higher education, and the model applied its criteria against that suppressed baseline. Under *Fordice*, a state violates the Equal Protection Clause when it adopts race-neutral policies that perpetuate the effects of a prior de jure system of segregation. Applying performance criteria to a baseline that is itself a vestige of Missouri's prior segregated system perpetuates the original constitutional violation. The criteria are further structurally arbitrary as applied to Lincoln University's open-admission, predominantly minority, land-grant mission: Measure 1B, which conditions funding on completion of 24 credit hours within two consecutive semesters, penalizes an institution whose students, disproportionately first-generation, working, and financially constrained, require flexible scheduling across three terms to reach the same milestone.

110. Second, the model applied to both land-grant institutions on paper and determined the funding of only one. The University of Missouri selected measures on which it was already performing, including federally financed research expenditures as its mission-specific measure, and earned on all five in every year; Lincoln University, measured on the student outcomes its underfunding had suppressed, lost performance funding in fiscal years 2014 and 2015. Upon information and belief, the University of Missouri's receipt of its state land-grant match has never been conditioned upon, reduced by, or withheld for failure to satisfy any performance criterion, while Lincoln University was required to demonstrate compliance with the same metrics as a practical condition of receiving funding that Missouri was already legally obligated to provide under 7 U.S.C. § 3222d. A performance framework that exists on paper for both institutions but determines the funding of only one is not a neutral policy; it is the differential treatment itself. This

differential treatment constitutes intentional disparate treatment of Lincoln University on the basis of race in violation of the Equal Protection Clause and Title VI. The University of Missouri and Lincoln University are similarly situated for purposes of the Second Morrill Act matching obligation. No legitimate educational justification exists for applying materially different levels of operational scrutiny to the two institutions' receipt of funds that both institutions are legally entitled to receive. The full scope of this differential treatment is subject to discovery.

111. This two-tiered system requires a historically Black institution to qualify for funds that are statutorily owed to it, while the predominantly white institution receives equivalent support automatically. Upon information and belief, matching funds withheld from Lincoln pursuant to the CBHE criteria system are reallocated within Missouri's higher education budget, disproportionately benefiting predominantly white institutions, constituting a constructive diversion of funds Congress intended to support Black land-grant education in Missouri.

***D. Continuing Nature of the Violations***

112. The violations alleged in this complaint are not discrete historical acts. They constitute a continuing pattern of unconstitutional and unlawful conduct that began in fiscal year 1987 and has not been remedied as of the date of filing. Each fiscal year in which Missouri appropriated state funds to Lincoln University below the level required by federal law, each fiscal year in which the CBHE mechanism operated against Lincoln University's suppressed discriminatory baseline, and each fiscal year in which Lincoln University was forced to divert general operating funds, forfeit federal allocations, or seek a federal waiver to cover Missouri's statutory obligation, constitutes a fresh, independently actionable violation within an ongoing pattern of constitutional and statutory harm. Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 to 381 (1982), and *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), where discriminatory acts are part of a continuing pattern, the entire pattern falls within the applicable limitations period as long as at least one act falls within that period. The most recent acts within the pattern alleged here, including the State's underpayment of the match in fiscal years 2022 through

2024, are well within the applicable limitations period, which for claims under 42 U.S.C. § 1983 and Title VI in Missouri is the five-year period of Mo. Rev. Stat. § 516.120(4).

113. Additionally, the full scope of Missouri's cumulative underfunding obligation was not known to Plaintiffs, and could not reasonably have been known, until the United States Secretaries of Agriculture and Education transmitted their formal calculation to Missouri's Governor on September 18, 2023. The statute of limitations therefore runs no earlier than that date under the discovery rule. Equitable tolling further applies because Missouri's failure to report transparently to the public, the routine grant of federal waivers without public documentation, and the absence of any affirmative enforcement action concealed the ongoing nature and full scope of the violation throughout the harm period. *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946).

114. Plaintiffs' injuries are continuing. The value of each alumni Plaintiff's Lincoln University credential, Plaintiff Jaff's opportunity to complete his degree at a fit institution, the conditions in which Plaintiff Harris lives, eats, and studies every day of her remaining enrollment, the course availability, facilities, and costs Plaintiff Jones works around in his land-grant program today, the housing, dining, advising, and connectivity on which Plaintiff Ware depends for the two academic years that remain to her, and the debt and working hours Plaintiff Kimble carries in place of the scholarship on which she enrolled, each depend on the present institutional standing and capacity of Lincoln University. That standing and capacity remain diminished so long as the vestiges of Missouri's de jure system continue to operate in the State's funding of the institution. Plaintiffs Harris, Kimble, Jones, and Ware, as currently enrolled students with between two semesters and two academic years beyond the current academic year remaining, are subject to the challenged funding practices today and will remain so for the foreseeable future; their claims for prospective relief present a live controversy that will not become moot before the Court can act. Prospective relief eliminating those vestiges would redress that continuing injury to each Plaintiff. *Milliken v. Bradley*, 433 U.S. 267, 289 to 290 (1977); *Papasan v. Allain*, 478 U.S. 265, 277 to 282 (1986).

***E. The Necessity and Tailoring of Structural Relief***

115. The relief Plaintiffs seek in the Prayer below includes a court-supervised remedial fund administered independently of the University and of the State. Plaintiffs plead the basis for that structure here so that its necessity and its limits are apparent on the face of the complaint.

116. A federal court may order a State to fund prospective remedial programs designed to eliminate the continuing effects of a constitutional violation in public education, and such relief is prospective notwithstanding that it requires substantial state expenditure. *Milliken v. Bradley*, 433 U.S. 267, 289 to 290 (1977). That authority is bounded. The remedy must be tailored to the specific violation found, and the ultimate objective of any decree is to restore state and local authorities to the control of their own institutions once the violation has been cured. *Missouri v. Jenkins*, 515 U.S. 70, 88 to 89, 98 to 102 (1995); *Freeman v. Pitts*, 503 U.S. 467, 489 to 490 (1992); *Board of Education v. Dowell*, 498 U.S. 237, 247 to 248 (1991). The relief sought here is drawn to those limits.

117. Each remedial category in the Prayer is traceable to a documented consequence of the violation alleged. Deferred maintenance of the physical plant, which Lincoln University's own president has quantified at approximately $87 million, resulted directly from the diversion of general operating funds to cover the State's unmet match. Faculty positions in chemistry, physics, biology, English, special education, and counseling were eliminated in 2013 because the institution could not sustain them. Land-grant research and extension capacity was forfeited, including a farm outreach position and $7,972,836 in federal allocations returned to USDA/NIFA. Students were de-registered in 2014 for balances the institution could not carry. The institution incurred debt to finance what the match would have paid for, and services that debt still. Residential, dining, health, and academic facilities deteriorated to the conditions Plaintiff Johnson experienced in the 1990s, Plaintiff Jaff documented in 2023 and 2024, and Plaintiff Harris lives in today. The remedial categories in the Prayer correspond to those documented injuries and to no others.

118. Independent administration of the remedial fund is necessary to the effectiveness of the remedy and does not displace state governance of the University. The State of Missouri is the

defendant whose violation the fund remedies. Lincoln University is an instrumentality of that State, governed by a Board of Curators appointed by the Governor, and the record establishes that the institution was compelled by the State's conduct to divert its own operating funds and forfeit federal allocations over a period of sixteen years. A remedial fund paid by the violator into the unrestricted control of the violator's own instrumentality would not reliably reach the injuries it is meant to cure. Independent custody and audit of the fund, and development of the remedial plan by a Special Master with the participation of the University, the State, the plaintiffs, students, faculty, and alumni, ensures that the fund is applied to the violation and to nothing else. The Board of Curators continues to govern Lincoln University in every respect. What the Court supervises is the integrity of the remedial expenditure, for a defined period, with a defined standard for termination.

119. A maintenance of effort requirement is likewise necessary. Absent such a requirement, the State could satisfy the fund from one appropriation while reducing Lincoln University's ordinary appropriation by an equivalent amount, leaving the institution in the same position the violation produced. Comparable decrees have uniformly included such a requirement, and Plaintiffs seek it here.

## CAUSES OF ACTION

### Count I: Violation of the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983 (Against Defendants Kehoe, Boggs, and Choi in Their Official Capacities)

120. Plaintiffs incorporate by reference all preceding paragraphs.

121. Defendants Kehoe, Boggs, and Choi, acting under color of state law, have violated and continue to violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment by administering a system of higher education funding that appropriates state funds to Lincoln University at a level below that appropriated to the University of Missouri, and that conditions Lincoln University's receipt of statutorily mandated matching funds on performance criteria that have never operated to condition, reduce, or withhold the University of Missouri's receipt of its match. This unequal funding is traceable to Missouri's prior de jure segregated system

of higher education, including Missouri's documented pattern, dating to its response to *Gaines v. Canada* in 1938, of using formally compliant but materially inadequate measures in response to legal mandates for Black educational equality. Race-neutral policies alone do not discharge Missouri's affirmative obligation to eliminate the vestiges of that system. *United States v. Fordice*, 505 U.S. 717 (1992).

122. The differential treatment alleged was undertaken with discriminatory purpose, as established by the historical background of Missouri's treatment of Lincoln University, the specific sequence of events including the State's receipt and disregard of notice in 2017 and 2023, the departures from the treatment accorded the University of Missouri, and the contemporaneous statements of the State's own agents. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

123. Each of these Defendants has the authority to administer, modify, or discontinue the challenged funding practices, and each has a sufficient connection to the enforcement of those practices to be a proper defendant for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs seek against these Defendants only prospective declaratory and injunctive relief. Plaintiffs Harris, Kimble, Jones, and Ware, as currently enrolled students, are presently subject to the challenged practices and will remain so throughout the pendency of this action, and each alumni Plaintiff suffers a continuing injury to the value of his or her credential that the same relief would redress.

**Count II: Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Against Defendants the State of Missouri and the Coordinating Board for Higher Education)**

124. Plaintiffs incorporate by reference all preceding paragraphs.

125. The State of Missouri and the Coordinating Board for Higher Education are recipients of federal financial assistance within the meaning of 42 U.S.C. § 2000d. Missouri's system of public higher education, including the land-grant programs at Lincoln University and the University of Missouri, is a program or activity receiving federal financial assistance.

126. These Defendants intentionally discriminated against Plaintiffs on the basis of race by funding Lincoln University, the institution Missouri designated for Black students under its de jure system, which remains the State's historically Black land-grant university and continues to enroll Black students in a far higher proportion than the University of Missouri, at a level below that provided to the University of Missouri, and by conditioning Lincoln's receipt of mandated matching funds on criteria that have never determined the University of Missouri's receipt of its match. Plaintiffs plead intentional discrimination and do not rest this Count on any theory of disparate impact. The intent is established by the allegations set forth above, including the historical background, the sequence of events, the departures from the treatment of the comparator institution, and the statements of the State's own agents.

127. Missouri knowingly and voluntarily waived Eleventh Amendment immunity for claims under Title VI by accepting federal financial assistance subject to 42 U.S.C. § 2000d-7(a)(1). Plaintiffs are entitled to compensatory damages against these Defendants for the educational and economic injuries each personally sustained, including, as to Plaintiff Harris, the out-of-pocket costs she has incurred and continues to incur for necessities the University cannot provide, and, as to Plaintiff Kimble, the loan obligations she has incurred and continues to incur in place of the scholarship on which she enrolled. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter judgment in their favor and grant the following relief:

***A. Declaratory Relief***

128. Declare that the State of Missouri's funding of Lincoln University from fiscal year 1987 through the present, including its failure to provide the state matching funds required as a condition of federal land-grant assistance and its application of the CBHE criteria-based mechanism to Lincoln University, violates the Equal Protection Clause of the Fourteenth

Amendment and Title VI of the Civil Rights Act of 1964, and constitutes a continuing vestige of Missouri's prior de jure system of segregated higher education that Missouri is obligated to eliminate under *United States v. Fordice*.

***B. Compensatory Damages***

129. Award to each Plaintiff, against Defendants the State of Missouri and the Coordinating Board for Higher Education, compensatory damages under Title VI in an amount to be proven at trial, measured by the educational and economic injury each Plaintiff personally sustained as a consequence of Defendants' intentional discrimination, including the diminished value of the education each received, the diminished value of the credential each holds, the costs each incurred that adequate institutional resources would have avoided, and the loss of earning capacity attributable thereto.

***C. Prospective Injunction: The Match Going Forward***

130. Enter prospective injunctive relief against Defendants Kehoe, Boggs, and Choi, in their official capacities, requiring the State of Missouri, through those officials, to: (a) provide a full dollar-for-dollar match of all federal 1890 land-grant funds allocated to Lincoln University in every future fiscal year, measured against the federal allocation for that same fiscal year; (b) eliminate the CBHE criteria-based mechanism as a condition of Lincoln University's statutory matching funds, and refrain from conditioning, reducing, or withholding those funds on the basis of any performance criterion, condition, or metric; and (c) certify to the Court annually, through the Commissioner, that the full match was appropriated and disbursed to Lincoln University for the preceding fiscal year without such conditions.

***D. The Lincoln University Remedial Fund***

131. Establish, as prospective relief under *Milliken v. Bradley*, 433 U.S. 267 (1977), the Lincoln University Remedial Fund, and order Defendants Kehoe, Boggs, and Choi, in their official capacities, to cause the State of Missouri to pay into the Fund the sum of $548,753,437, representing the documented shortfall of $223,780,941, stated in the nominal dollars of the fiscal years in which it accrued, together with prejudgment interest of $324,972,497, on a schedule fixed

by the Court not to exceed three fiscal years, that sum representing the measure of the institutional capacity that Missouri's violation withheld and that the Fund must restore. The federal figure of $361,569,760 states the same shortfall in constant 2020 dollars. So that the time value of money is not compensated twice, Plaintiffs restate each fiscal year's shortfall in the nominal dollars of that year, using the Bureau of Labor Statistics Consumer Price Index annual averages that the federal dataset applied, and compute prejudgment interest on the nominal amounts at five percent per annum, simple, from the midpoint of the fiscal year in which each shortfall accrued through October 6, 2026. The year-by-year restatement and interest computation are set forth in Exhibit C. Prejudgment interest is presumptively available in federal civil rights cases to make the injured whole. *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975). Plaintiffs reserve the right to seek recalculation upon completion of discovery, including incorporation of post-2020 data and application of compound interest if supported by expert testimony.

132. Order that the Fund be held by an independent fiscal agent appointed by the Court, and that no portion of the Fund be held by, deposited with, or subject to the control of Lincoln University, the Lincoln University Foundation, the Board of Curators, the Coordinating Board for Higher Education, or any agency of the State of Missouri.

***E. The Special Master and the Remedial Plan***

133. Appoint a Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure to develop the Remedial Plan described below, to supervise its implementation, to administer the Fund through the fiscal agent, and to report to the Court not less than quarterly.

134. Order that the Special Master develop the Remedial Plan in consultation with an Advisory Committee composed of: a designee of the Plaintiffs; a designee of The 1866 Alumni Association, Inc.; the President of the Lincoln University Student Government Association or a designee; a representative of the Lincoln University faculty selected by the faculty; a designee of the President of Lincoln University; and a designee of the Commissioner of Higher Education and Workforce Development. The Special Master shall consider the recommendations of the Advisory Committee and shall resolve any disagreement among its members. The Special Master shall

submit the Remedial Plan to the Court for approval within one hundred eighty days of appointment, and the Plan shall take effect upon the Court's approval.

135. Order that Lincoln University implement the approved Remedial Plan under the direction of the Special Master, and that the University report to the Special Master quarterly on the status of each element of the Plan. Nothing in this relief displaces the authority of the Board of Curators to govern Lincoln University in any respect other than the application of the Fund.

***F. Permitted Uses of the Fund***

136. Order that expenditures from the Fund be limited to the following categories, each of which corresponds to a documented consequence of the violation alleged herein: (a) rehabilitation of the physical plant and remediation of deferred maintenance, including residential facilities, dining facilities, academic and laboratory facilities, Richardson Auditorium and other performance and instructional spaces, and athletic and physical education facilities; (b) faculty and instructional positions in the sciences, English, special education, counseling, and other disciplines in which positions were eliminated or could not be sustained as a consequence of the violation, together with the compensation necessary to recruit and retain qualified faculty; (c) land-grant research and cooperative extension capacity, including positions, facilities, and programs of the kind the unmatched federal funds were appropriated to support; (d) student support services, including academic advising, health and mental health services, and a student financial hardship fund to prevent de-registration for unpaid balances; (e) development or restoration of academic programs curtailed or foreclosed by the violation; (f) retirement of indebtedness that the Special Master determines, upon review of the University's debt instruments and the purposes to which their proceeds were applied, was incurred by Lincoln University as a consequence of the violation, so that the institution's future resources are not consumed by the cost of the State's past default; and (g) the endowment described in Part G. No expenditure outside these categories shall be made from the Fund absent a written amendment to the Plan approved by the Court.

### *G. The Lincoln University 1890 Trust*

137. Order that not less than twenty percent of the Fund be placed in a permanent trust, to be known as the Lincoln University 1890 Trust, held by independent trustees appointed by the Court on the recommendation of the Special Master, outside the control of the University, the Lincoln University Foundation, and the State, under a trust instrument approved by the Court. The income of the Trust shall support, in perpetuity, endowed faculty positions, land-grant research and extension programs, and need-based financial aid for students of Lincoln University. The corpus of the Trust shall not be invaded, and the Trust shall survive the termination of the Court's supervision under Part J.

### *H. Integrity of the Fund*

138. Order that: (a) no contract funded in whole or in part from the Fund shall be awarded to any person or entity in which a member of the Board of Curators, an officer of the University, an officer of the State, or a member of the immediate family of any of them holds a financial interest; (b) no compensation to any administrative officer of the University shall be paid from the Fund in excess of a cap fixed by the Special Master; (c) no portion of the Fund shall be applied to debt service on any obligation incurred before the entry of judgment, except for the retirement of indebtedness the Special Master has determined under Part F(f) was incurred as a consequence of the violation; (d) every contract funded from the Fund above a threshold fixed by the Special Master shall be awarded through competitive procurement; and (e) every disbursement from the Fund shall be recorded and published on a public website maintained by the fiscal agent within thirty days.

139. Order that the Fund and all expenditures from it be audited annually by an independent accounting firm selected by the Special Master, that the audit be filed with the Court, and that it be made public.

140. Retain authority to order the recovery and redirection to the Fund of any amount the Court finds to have been expended in violation of the Plan or of this judgment, from any person or entity that received it.

***I. Maintenance of Effort***

141. Order that in each fiscal year of the remedial period, the State of Missouri's general appropriation to Lincoln University, exclusive of the land-grant match and exclusive of any payment into the Fund, shall be not less than the State's general appropriation to Lincoln University for fiscal year 2026, adjusted annually by the same percentage change applied to the State's general appropriation to the University of Missouri, and that no payment into the Fund shall substitute for, offset, or reduce any appropriation the State would otherwise make to Lincoln University. The Commissioner shall certify compliance with this requirement to the Court annually.

***J. Retained Jurisdiction and Termination of Supervision***

142. Retain jurisdiction over this action for a remedial period of ten years from the entry of judgment, conduct an annual review of compliance on the report of the Special Master, and terminate the Court's supervision, in whole or in part, upon a showing that: (a) the Fund has been fully paid by the State within the schedule fixed under Part D and fully disbursed in accordance with the approved Plan; (b) the objectives of the Plan have been substantially achieved, as certified by the Special Master; and (c) the State has provided the full land-grant match to Lincoln University, without any criteria-based condition, for seven consecutive fiscal years. Any Defendant may move for termination of supervision on that showing. *Freeman v. Pitts*, 503 U.S. 467 (1992); *Board of Education v. Dowell*, 498 U.S. 237 (1991). The Lincoln University 1890 Trust shall continue in perpetuity notwithstanding termination of supervision.

***K. Fees and Costs***

143. Award reasonable attorney's fees and costs to Plaintiffs' counsel pursuant to 42 U.S.C. § 1988, in amounts to be determined by fee petition following entry of judgment, consistent with the lodestar methodology of *Hensley v. Eckerhart*, 461 U.S. 424 (1983).

***L. Other Relief***

144. Grant such other and further relief as this Court deems just and equitable.

**JURY DEMAND**

Plaintiffs demand trial by jury on all claims so triable.

Respectfully submitted,

____________________________________

Donald Calloway, Jr.
Calloway Law | Public Interest Counsel
Missouri Bar No. 58145
W.D. Mo. Admission No. [________]
10221 River Road, #59108
Potomac, Maryland 20859
don@calloway.law
(447) 225-5692

____________________________________

Kenneth Powell III
Powell Law Firm
Missouri Bar No. 69285
kenny@plfirm.com

BOYD LEGAL SOLUTIONS
/s/ L. Jared Boyd
L. Jared Boyd, Mo. Bar No. 60838
5585 Pershing, Suite 240
St. Louis, Missouri 63112
(314) 941-5942, Phone
(314) 735-9655, Fax
jared@synergistic-group.com

Counsel for Plaintiffs

Dated: _______________, 2026